**Sanjay Wadhwa**
**Adam Grace**
**Paul G. Gizzi**
**John Lehmann**
**Brenda Wai Ming Chang**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0077 (Gizzi)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

| | |
|---|---|
| **SECURITIES AND EXCHANGE** ) | |
| **COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | **COMPLAINT** |
| ) | |
| **v.** ) | **ECF CASE** |
| ) | |
| **JOHN MADSEN, ANDALUSIAN RESORTS** ) | |
| **and SPAS, INC., and BERNARD FRIED** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants John Madsen ("Madsen"), Andalusian Resorts and Spas, Inc. ("ARSP"), and

Bernard Fried ("Fried") (collectively, "Defendants"):

### SUMMARY

1.     From at least November 2013 through May 2014, Madsen orchestrated a classic –

albeit unsuccessful – pump-and-dump securities fraud scheme.  Madsen gained control of ARSP,

a reverse merger-created publicly traded company with virtually no assets or operations, and

utilized various means, including the public dissemination of materially false and misleading

corporate press releases, to artificially inflate the value of ARSP's stock and induce unsuspecting investors to purchase it.

2.      Madsen, who had previously pled guilty to a federal felony mail fraud charge relating to a fraudulent loan scheme that took place between 1994 and 1998 and had settled a civil action brought against him by a state securities regulator for participating in a fraudulent private unregistered stock offering between 2001 and 2002, concealed his control of ARSP through the use of a strawman.  Specifically, Madsen enlisted Fried to serve as ARSP's President and Chief Executive Officer ("CEO") and, along with a ring of other participants (the "ARSP Schemers"), engaged in a scheme to artificially increase the trading volume and price of ARSP's stock, in part by disseminating materially false and misleading information to the public through corporate press releases extolling the company's business plan and prospects for success.

3.      Fried, in his capacity as ARSP's President and CEO, knowingly made numerous materially false and misleading statements in ARSP press releases touting the company's intent to acquire the Mona Lisa Hotel and Casino ("Mona Lisa Hotel") located in San Jose, Costa Rica. The closing terms, not disclosed to the public in the relevant press releases, provided that the closing of the transaction would take place when ARSP's stock closed at or above $1.10 for ten consecutive days, at which point ARSP would be required to deliver $10 million in newly issued shares of restricted stock to the purported owner of the Mona Lisa Hotel.  Alternatively, under the terms of the transaction's letter-of-intent ("LOI" or "letter of intent"), fully executed on April 6, 2014, the seller had the option to demand $10 million in cash instead of ARSP stock.

4.      Over a month later, Fried – acting at Madsen's direction – caused ARSP to announce the signing of the Mona Lisa Hotel LOI in two press releases issued on May 12 and May 14, 2014.  At the time of the press releases, Madsen and Fried knew, or were reckless in not

knowing, that ARSP could not legitimately close this transaction in the near future, both because ARSP did not have, and could not readily obtain, financing for $10 million in cash **and** the company's stock was trading for only pennies – *i.e.,* well below the $1.10 per share price provided for in the LOI.

5.        The ARSP scheme came to a halt on May 19, 2014, when the Commission suspended trading in ARSP's securities only a week after the company had released its first fraudulent press release about its purported LOI to acquire the Mona Lisa Hotel.

6.        By this action, the Commission seeks injunctive relief, disgorgement of the Defendants' ill-gotten gains, along with prejudgment interest thereon, civil penalties, penny stock bars against Madsen and Fried, and an officer and director bar against Fried.

## VIOLATIONS

7.        Based on the conduct alleged in this Complaint, the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws, as follows:  (a) Fried and ARSP violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (b) Madsen violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j (b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and Madsen aided and abetted ARSP's and Fried's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j (b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.        The Commission brings this action pursuant to the authority conferred by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking to permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged in

3

this Complaint.  The Commission also seeks a final judgment:  (i) ordering Fried and Madsen to

disgorge their ill-gotten gains and to pay prejudgment interest thereon; (ii) imposing civil money

penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (iii)

prohibiting Fried and Madsen from participating in an offering of penny stock pursuant to

Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (iv) barring Fried from acting

as an officer or director of an issuer of securities pursuant to Section 21(d)(2) of the Exchange

Act [15 U.S.C. § 78u(d)(2)].

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and Section 27

of the Exchange Act [15 U.S.C. § 78aa].  A substantial part of the events or omissions giving rise

to the claims in this Complaint occurred in the Southern District of New York.  For instance,

while the Defendants engaged in the alleged fraudulent conduct, including the public

dissemination of materially false and misleading press releases, certain residents of this District

purchased and sold ARSP securities.

11.      In connection with the conduct alleged in this Complaint, the Defendants, directly

or indirectly, have made use of the means or instrumentalities of interstate commerce, or of the

mails, or of the facilities of a national securities exchange.

## DEFENDANTS

12.      Madsen, age 59, resides in Las Vegas, Nevada.  Madsen is the Managing Partner

of Leading Horses Consulting LLC, exclusive consultants for ARSP.  Madsen, who has a

criminal and regulatory history and is the subject of numerous related private lawsuits, is in the

4

business of obtaining public shell companies to facilitate reverse mergers, and soliciting money from investors.  On November 5, 2001, Madsen pled guilty to mail fraud in U.S. District Court, District of Arizona, for his involvement in a fraudulent loan scheme that took place between 1994 and 1998, was sentenced to five years of probation, and ordered to pay $2.4 million in criminal restitution.  *United States v. John J. Madsen*, 01-cr-1010 (D. Ariz.).  In 2004, Madsen settled a civil regulatory action with the Arizona Corporation Commission for violations of the Arizona Securities Act's securities registration and securities sales provisions for his participation in a fraudulent private unregistered stock offering between 2001 and 2002, in which he consented to a cease and desist order, payment of $590,951 in restitution plus interest, and payment of $25,000 in administrative penalties.  *See* Arizona Corporation Commission, Docket No. S-03523A-03-0000, Decision No. 67086, entered June 29, 2004.

13.     Fried, age 72, resides in Overland Park, Kansas.  Fried has had a varied professional career, primarily in the telecommunications and customer support industries.  As of November 2013, Fried did not have a regular job generating a steady stream of income.  Around that time, Madsen asked Fried to serve as ARSP's President and CEO, and to sign the paperwork necessary to effect the reverse merger of ARSP into a dormant, publicly traded shell company. Prior to joining ARSP, Fried had no educational training or experience in the hospitality sector. Fried quickly realized that he was acting as ARSP's President and CEO in name only, while Madsen made all substantive and strategic decisions for the company.  Fried resigned as ARSP's President and CEO in June 2014 after the Commission issued the ARSP trading suspension. However, according to a June 16, 2014 ARSP press release naming a new President and CEO, Fried stayed on as ARSP's Chairman of the Board, Treasurer, and Secretary.

14.     ARSP is a Nevada corporation whose business license was revoked by the

Nevada Secretary of State on January 31, 2015.  Its common stock was previously quoted on

OTC Link operated by OTC Markets Group Inc. (ticker: ARSP), but since the Commission

ordered a trading suspension of ARSP's securities on May 19, 2014, the company has been

labeled "Caveat Emptor" on OTC Market Group Inc.'s website.  The company did not have a

class of securities registered pursuant to the Exchange Act.  ARSP's stock qualifies as a "penny

stock" as defined by Section 3(a) (51) of the Exchange Act [15 U.S.C. § 78c (a) (51)] and Rule

3a51-1 thereunder [17 C.F.R. § 240-3a51-1].  According to the company's press releases,

ARSP's business plan purported to be the acquisition and management of a chain of international

premier luxury boutique hotels and resorts catering to the lesbian, gay, bisexual and transgender

("LGBT") community.

## FACTS

**I.     Madsen Gains Control of ARSP and Recruits
        Fried to Act as Strawman President and CEO.**

   15. In or around the fall of 2013, Madsen, with the assistance of others, identified a

publicly traded micro-cap shell company, Hui Ying Technology and Media Group Holding

Company ("HUIY"), which he intended to purchase and use as an acquisition vehicle for the

privately-held ARSP, which Madsen already controlled.

   16. On November 3, 2013, having recruited Fried to act as his nominee and to serve,

in name only, as President and CEO of ARSP, Madsen directed Fried to enter into a share

purchase agreement to buy a controlling block of HUIY stock from its then-majority

shareholders.  Madsen had the controlling block transferred into Fried's name.  Fried did not pay

any money for the stock.

   17. On November 14, 2013, Madsen emailed to Fried an option agreement to grant

Madsen the right to purchase Fried's control block of HUIY stock representing all common

shares and all preferred shares of the company that Fried owned, for the fixed consideration of $10,000 at any time within the following five years, regardless of the then current market price of the stock.  Fried executed the option agreement in Madsen's favor.

18.     As reflected in the stock transfer log maintained by ARSP's transfer agent, the control block of HUIY (later ARSP) stock was never transferred out of Fried's name.  However, Fried's stock certificate was held by Madsen in a safe and Fried never obtained possession of it.

19.     In mid-November 2013, at Madsen's direction, Fried authorized and completed a reverse merger whereby HUIY acquired the private company ARSP.

20.     A press release dated December 2, 2013 announced HUIY's acquisition of ARSP and Fried's appointment as the new President of HUIY.

21.     On March 6, 2014, the combined company officially changed its name and stock ticker symbol from HUIY to ARSP.

22.     ARSP's business plan, as described in numerous press releases, was to first acquire and then manage a chain of "4 or 5 star rat [ed]" luxury boutique LGBT friendly resorts and spas, although it had no meaningful assets with which to purchase or operate these real estate assets.

23.     At Madsen's direction, Fried nominally served as newly-formed ARSP's President, CEO, Secretary, Treasurer, and Chairman of the Board, despite having no previous educational training or practical experience in the hospitality industry.  Fried knew, or was reckless in not knowing, that contrary to his President and CEO titles identified in ARSP's corporate documents and press releases, Madsen was fully in charge of ARSP.

24.     Although Madsen was retained as a "consultant" for ARSP, in fact Madsen was actually making all of the substantive and strategic decisions for the company.  Meanwhile,

Fried's true role for ARSP was to be a strawman for Madsen. Fried knew that Madsen was fully in control of ARSP, and that he (Fried) was just acting as Madsen's nominee.

25.     Madsen was aware, and conveyed to Fried, that his criminal record, as well as the existence of a damaging third-party website that focused on alleged fraudulent conduct by Madsen and a business partner, could negatively affect ARSP if he was held out to the public as the company's CEO. Fried understood that he was appointed to head ARSP simply because of his "clean" background in contrast to Madsen's checkered past.

26.     Both Madsen and Fried also knew, or were reckless in not knowing, that the press releases about ARSP's purported intent to acquire the Mona Lisa Hotel contained materially false and misleading information, and were intended to artificially increase investor demand for the stock and the stock's price, allowing certain ARSP Schemers holding unrestricted stock to profit from stock sales. A higher stock price could also be used to facilitate ARSP's acquisition of hotel properties by using its artificially inflated stock as consideration instead of cash.

27.     At Madsen's direction, in December 2013, the company engaged a consultant ("Consultant"), along with his company ("Consultant Brothers"), to provide "brand awareness & product sales for [ARSP], merger & acquisition advisory services, and business financing services." Consultant was tasked with helping Fried draft and publish ARSP press releases to generate investor interest in the company, for the purpose of increasing demand for and the price of ARSP's stock.

28.     Madsen recruited, both directly and indirectly, additional ARSP Schemers to help generate interest in ARSP and its stock.

29.     Fried's primary ARSP-related functions were to sign documents on behalf of the company and to draft and publicly issue ARSP press releases at Madsen's prompting.

30.     Fried did not have a formal employment contract with ARSP.  Although lured by the promise of higher compensation in the form of ARSP stock and salary, Fried was only paid approximately $3,000 for his work with ARSP, which was commensurate with his actual (nominal) role in the company.

31.     Fried did not contribute any of his own money to capitalize ARSP or to even pay for the control block of ARSP stock.  Instead, ARSP relied on funding obtained from Madsen to pay purported employees' salaries and the company's operating expenses.

32.     While Fried opened at least one bank account for ARSP, he shared signatory authority over the account with Madsen's personal bookkeeper.  Fried only used ARSP's funds to issue checks and make payments pursuant to Madsen's instructions.

33.     Madsen controlled all of the substantive and strategic decision-making for ARSP, including the identification of potential properties to acquire.  Not only was Fried relegated to a marginal role with regard to potential acquisitions, but virtually all information concerning those potential deals was conveyed to him by Madsen.

34.     In drafting press releases promoting the company's corporate actions, Fried relied on Madsen to supply him with information to include in the press releases, including even revenue projections taken from financial figures Madsen provided to Fried, which Fried never questioned or sought back-up for.

## II.     ARSP's Letter of Intent to Acquire the Mona Lisa Hotel

35.     On April 5, 2014, Fried, acting at Madsen's direction, signed the LOI to purchase the Mona Lisa Hotel from Costa Rican company 3-101 6417245A ("Company 724") for consideration valued at $10 million.

36.     While Fried was included on some email communications about the Mona Lisa

9

Hotel, he had almost no personal involvement in sourcing, conducting due diligence for, or

negotiating the terms of the proposed transaction.  Indeed, on April 5, 2014, it was Madsen, not

Fried, who sent an email to the ARSP Schemers and others, stating, "We have agreed by both

sides to a stock exchange [] for two Hotel Casinos COSA RICA [sic].  We are able to take

possession as early as next Friday!!!!"

37.     Madsen, not Fried, negotiated the terms of the Mona Lisa Hotel LOI with an

attorney ("Attorney A"), who claimed to be the authorized officer of Company 724 and

countersigned the LOI on April 6, 2014.

38.     Pursuant to the LOI, Company 724 agreed to "convey to [ARSP] marketable and

insurable title to said real property at closing," in return for which ARSP promised to pay

$10,000,000 in restricted stock priced at $1.10 per share.

39.     Although ARSP's stock was not trading anywhere near $1.10 at the time, the LOI

provided that the closing "will take place when shares in [ARSP] trade at a minimum of $1.10

per share for a consecutive ten day period."  However, the seller also reserved the right to require

ARSP to pay the purchase price in cash, specifically, "[w]ithin 72 hours of closing, with prior

written notice, Seller reserves the right to convert the method of payment in whole or in part to

US dollars and/or US dollar equivalent at the time of closing."  The LOI provided that the

closing "shall" take place on or before the 30th calendar day after a 30 to 45 day due diligence

period, with due diligence to begin from the date the parties enter into a definitive agreement.

40.     During the week prior to Fried signing the LOI, ARSP's stock had an average

closing price of only $0.18, thus, the stock price needed to increase by over 600% before ARSP

could even contemplate financing the deal at closing with restricted stock.

41.     The LOI provided that the "[p]arties shall use their best reasonable efforts to enter

into a definitive agreement embodying the terms and provision[s] contained herein within 20

business days following the signing of this LOI."  With hardly any corporate assets that could be

used to fund the cash purchase or any new/pending business projects that could reasonably and

legitimately raise ARSP's stock price to $1.10, both Fried and Madsen knew, or were reckless in

not knowing, that the Mona Lisa Hotel acquisition was very unlikely to close pursuant to the

terms of the LOI.

### III.   Consultant Brothers' Purported $10 Million Financing Commitment Letter

42.    The LOI required ARSP to provide Attorney A with proof of available funds for

the Mona Lisa Hotel purchase within "48 hours from acceptance of this LOI."  At that time,

Fried and Madsen knew, or were reckless in not knowing, that the company had virtually no cash

or other marketable assets that could have easily been converted into cash.

43.    To demonstrate to Company 724 its purported ability to finance the hotel

acquisition as required under the terms of the LOI, ARSP obtained a commitment letter from

Consultant Brothers on April 11, 2014, and thereafter forwarded it on to Attorney A.

44.    The Consultant Brothers' commitment letter, signed by Consultant, begins:

"Please be advised of the following commitments for up to $10,000,000 million [sic] to assist in

the purchase of (as specified in the Andalusian Letter of Intent) the Mona Lisa Hotel…."

However, the nature and source of the "commitments" identified in the rest of the letter were, on

their face, indefinite and inadequate.

45.    The letter states that Consultant Brothers is working with a Financier and his two

entities to provide financing for ARSP's acquisition of the Mona Lisa Hotel, but notably the

letter describes a potential transaction "for up to $6 million" and says that the Financier's entities

"can issue definitive documents the same day that Due Diligence is received," which obviously

had not occurred yet.

46.     In fact, Financer and his entities did not have any involvement with, or intent to provide financing to, ARSP.

47.     Madsen and Fried knew, or were reckless in not knowing, that Consultant Brothers did not have the ability, directly or indirectly, to provide ARSP with the $10 million to finance a cash purchase of the Mona Lisa Hotel.

**IV.    Fried, at Madsen's Direction, Made Materially False and Misleading Statements in ARSP Press Releases Concerning the Acquisition of the Mona Lisa Hotel.**

48.     Although the LOI between ARSP and Company 724 was fully executed on April 6, 2014, and "best reasonable efforts" were to be used by both parties "to enter into a definitive agreement" for the sale of the Mona Lisa Hotel within the next 20 business days, ARSP did not even publicly disclose the LOI for over a month.

49.     Fried, at Madsen's direction, drafted all of ARSP's press releases until Fried resigned as the company's President and CEO in June 2014.  Consultant A helped Fried to "dress them up" to make them more attractive to potential investors before they were issued to the public.

50.     On May 12, 2014, at Madsen's direction, Fried drafted and caused ARSP to issue a press release announcing that ARSP had signed the LOI to acquire the Mona Lisa Hotel.  None of the substantive terms contained in the LOI – including the purchase price, the form of consideration to be used, the unusual circumstances under which closing could occur, the availability of financing, and the closing schedule – were disclosed in the press release.  Given ARSP's then dismal financial condition, the current market price of its stock, and the unusual and highly unrealistic terms of the LOI, the press release was materially misleading in that it did not provide investors with sufficient information to evaluate the probability of the acquisition

actually moving forward pursuant to the LOI.

51.    The May 12 press release also failed to disclose that the LOI had been entered into in early April 2014 and, yet, a definitive acquisition agreement had not been executed.

52.    The May 12 press release included a quote from Fried, as ARSP's President and CEO, stating, "After completion of this transaction and integration of our business plan, we hope to realize revenues of US $4,800,000 in the first full year…. The parties are close to finalizing the terms of the acquisition and we estimate that the final terms of the acquisition will be announced to the shareholders within the next few weeks.  The completion of the acquisition is dependent on, among other things, the completion of due diligence satisfactory to the Company."

53.    Two days later, on May 14, 2014, at Madsen's direction and assisted by Consultant A, Fried drafted and authorized the issuance of yet another ARSP press release concerning the Mona Lisa Hotel transaction.  Fried, again identified as ARSP's President and CEO, is quoted in the press release as saying, "This acquisition of the Mona Lisa Hotel … adds to the excitement for the Company and its shareholders.  [ARSP's] pledge is to continue to inform the shareholders on the status of the projects and continue to move the Company forward and implement [ARSP's] Business Plan to provide increased shareholder value."

54.    Although the May 14 press release stated that its purpose was to provide "additional details in regard to the [LOI] for the acquisition of the Mona Lisa Hotel," none of the preliminary substantive terms and conditions agreed to and memorialized in the LOI were actually disclosed.  Rather, the press release included the text of a forward-looking letter from Attorney A to Fried about the Mona Lisa Hotel and its future business prospects.

55.    In the letter, Attorney A identifies himself as the "current owner, attorney and investor of the Mona Lisa [Hotel]."  On the same day, ARSP re-issued its May 12 press release.

56.     Madsen and Fried were aware that several news sources including Bloomberg, Marketwatch.com, Businesswire.com, and Money.msn.com took note of the ARSP press releases regarding the LOI and posted or discussed them on their websites.

57.     On May 19, 2014, the Commission issued an order suspending trading in ARSP's securities due to "questions concerning the adequacy and accuracy of assertions by ARSP, and by others, in press releases and other public statements to investors concerning, among other things, the company's business combinations."  SEC Exchange Act Rel. No. 34-72183.

58.     On May 20, 2014, Fried caused ARSP to issue a press release acknowledging the trading suspension and included an internet link to a copy of the LOI that "contains more detailed information regarding the terms of the acquisition."

**V.     Defendants Failed to Verify Attorney A's and Company 724's Ownership of the Mona Lisa Hotel Prior to Issuing Press Releases Touting the LOI.**

59.     When Fried, acting at Madsen's direction, caused ARSP to issue the May 12 and May 14 press releases touting the LOI, neither Attorney A nor his Company 724 owned legal title to the Mona Lisa Hotel.  While Company 724 held a lease to operate the hotel, legal title to the Mona Lisa Hotel was held by an unaffiliated Costa Rican company, Hotelera Amon S.A. ("Hotelera Amon").

60.     At the time of the issuance of the May 12 and May 14 press releases, ARSP's local Costa Rican attorney had not received any verification of Attorney A's and Company 724's purported direct or indirect ownership of, or legal title to, the Mona Lisa Hotel.

61.     Ultimately, the May 12 and May 14 press releases were intended to mislead the public about the likelihood of the Mona Lisa Hotel acquisition.  A definitive agreement was never reached between ARSP and the true owners of the Mona Lisa Hotel.  Nor was ARSP ever able to satisfy the key terms of the LOI.  In directing Fried to draft and publicly disseminate

14

these press releases, Madsen intended to fraudulently generate demand for ARSP's stock and increase its share price, which would enable Madsen or others to profit from selling their shares of ARSP stock to the unwary investing public.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Defendants ARSP and Fried)

62.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 60 of this Complaint.

63.     By engaging in the conduct described above, Defendants ARSP and Fried, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon other persons.

64.     By reason of the foregoing, Defendants ARSP and Fried violated and, unless restrained and enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)
### (Defendant Madsen)

65.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 60 of this Complaint.

66.     By engaging in the conduct described above, Defendant Madsen, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, has:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon other persons.

67.     By reason of the foregoing, Defendant Madsen violated and, unless restrained and enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Defendant Madsen)**

68.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 61 of this Complaint.

69.     By engaging in the conduct described above, Defendant Madsen knowingly or recklessly provided substantial assistance to ARSP and Fried, who each, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading.

70.     By engaging in the conduct described above, Defendant Madsen aided and abetted, and unless restrained and enjoined, is reasonably likely to continue to aid and abet

violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b)

thereunder [17 C.F.R. § 240.10b-5(b)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court issue a Final

Judgment:

### I.

Permanently restraining and enjoining Defendants, their agents, servants, employees and

attorneys and all persons in active concert or participation with them, who receive actual notice

of the injunction by personal service or otherwise, and each of them, from committing future

violations of each of the securities laws and rules promulgated thereunder as alleged in this

Complaint.

### II.

Ordering Defendants Fried and Madsen to disgorge any and all ill-gotten gains from the

illegal conduct alleged in this Complaint, and to pay prejudgment interest thereon.

### III.

Ordering Defendants Fried and Madsen to pay civil money penalties pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering Defendants Fried and Madsen to be barred from participation in any offering of

a penny stock pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

### V.

Ordering Defendant Fried to be barred from serving as an officer or director of an issuer

of securities pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## VI.

Granting such other and further relief as this Court deems just and proper.

Dated:  October 27, 2017
        New York, New York

Respectfully submitted,

*Sanjay Wadhwa*

Sanjay Wadhwa
Adam Grace
Paul G. Gizzi
John Lehmann
Brenda Wai Ming Chang
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0077 (Gizzi)
gizzip@sec.gov