UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )   **17-CV-8300 (JMF)(SN)** |
| JOHN MADSEN, ANDALUSIAN RESORTS and SPAS, INC., and BERNARD FRIED, | ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR THE IMPOSITION OF A CIVIL MONEY PENALTY
AGAINST DEFENDANT JOHN MADSEN**

Paul G. Gizzi (gizzip@sec.gov)
Brenda W.M. Chang (changb@sec.gov)
John Lehmann (lehmannj@sec.gov)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1100

# TABLE OF CONTENTS

I.    STATEMENT OF FACTS ...................................................................................1

    A.  Andalusian Resorts and its common stock ..............................................1

    B.  Madsen gained control of Andalusian Resorts and recruited Fried to act as straw-man CEO.......................................................................................2

    C.  Andalusian Resorts' Letter of Intent to acquire the Mona Lisa Hotel.......................5

    D.  At Madsen's direction, Fried made materially false and misleading statements in Andalusian Resorts' press releases concerning the purported acquisition of the Mona Lisa Hotel............................................................................7

    E.  Madsen failed to verify ownership of the Mona Lisa Hotel prior to directing Fried to have Andalusian Resorts issue the press releases touting the LOI.................9

II.   ARGUMENT .............................................................................................10

    A.  The Exchange Act establishes three tiers of civil monetary penalties........................10

    B.  A third tier penalty is appropriate as to Madsen .................................................11

        1.  Madsen's conduct was egregious...........................................13

        2.  Madsen acted with a high degree of scienter ..................................13

        3.  Madsen's conduct created the risk of substantial losses to other persons ............14

        4.  Madsen's conduct was recurrent and not isolated ..............................15

        5.  The maximum penalty amount should not be reduced based on Madsen's financial condition ..............................................................15

    C.  The Court has broad discretion to determine the number of violations.....................15

III.  CONCLUSION........................................................................................17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Reserve Fund Sec. & Derivative Litig.*, No. 09-cv-4346 (PGG), 2013 WL 5432334
(S.D.N.Y. Sept. 30, 2013) ............................................................................................... 15

*SEC v. Alternative Green Technologies, Inc.,* No. 11-cv-9056 (SAS), 2014 WL 7146032
(S.D.N.Y. Dec. 15, 2014) ......................................................................................... 12, 16. 17

*SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2001) ................................................... 12

*SEC v. East Delta Resources Corp.*, No. 10-cv-310 (SJF), 2012 WL 3903478 (E.D.N.Y.
Aug. 31, 2012) ............................................................................................................. 12, 16

*SEC v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007) .......................................... 12

*SEC v. Kane*, No. 97-cv-2931 (CBM), 2003 WL 1741293 (S.D.N.Y. Apr. 1, 2003) ........... 13, 14

*SEC v. Kern,* 425 F.3d 143 (2d Cir. 2005) .................................................................. 11, 12

*SEC v. Lybrand*, 281 F. Supp. 2d 726 (S.D.N.Y. 2003) ............................................... 12

*SEC v. McCaskey*, No. 98-cv-6153 (SWK), 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002).... 12, 14

*SEC v. Metcalf*, No. 11-cv- 493 (CM), 2012 WL 5519358 (S.D.N.Y. Nov. 13, 2012)................ 11

*SEC v. Opulentica*, 479 F. Supp. 2d 319 (S.D.N.Y. 2007) ........................................... 12

*SEC v. Palmisano,* 135 F.3d 860 (2d Cir. 1998)........................................................... 10

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013) ............................. 16

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013)............................................................ 11

*SEC v. Tourre*, 4 F. Supp. 3d 579 (S.D.N.Y. 2014) ................................................... 11, 12

*SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552 (S.D.N.Y. 2009) ......................... 10

**Statutes**

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).................................... 16

Section 3(a)(51) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c (a) (51) .................... 2

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .......................... 10, 16

Section 21(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(3) ...................... 10

## Other Authorities

*Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2018)* (available at: https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm); Release Nos. 33-9387, 34-68994, IA-3557, IC-30408, dated February 27, 2013 (effective Mar. 5, 2013), previously found at 17 CFR 201.1005 and Table V to Subpart E of Part 201 .............. 11

## Rules

Exchange Act Rule 3a51-1, 17 C.F.R. § 240-3a51-1 ...................................................... 2

Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 ................................................... 10, 16

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") respectfully submits this memorandum of law in support of its motion for the imposition of a third tier civil monetary penalty against defendant John Madsen ("Madsen"). On March 12, 2018, the Court entered a judgment on consent as to Madsen that ordered all of the non-monetary relief sought in the complaint, and provided in Section III of the judgment for the Court to determine, on motion of the Commission, the amount of monetary relief, if any, to be ordered against Madsen (docket no. 27). The Commission has withdrawn its claims for disgorgement plus prejudgment interest (*see* docket no. 45). Therefore the sole remaining claim in this action is the Commission's claim for civil penalties as to Madsen. The Commission respectfully submits that the Court should impose a maximum third tier civil penalty against Madsen for his fraudulent conduct, as set forth in the Commission's Complaint. As set forth Section III of the judgment, Madsen is precluded from arguing that he did not violate the securities laws as alleged in the complaint, and for purposes of the motion the allegations are to be accepted as and deemed true by the Court. Accordingly, the Commission respectfully requests that the Court enter a final judgment imposing a third tier monetary penalty, in addition to the relief previously ordered in the March 12, 2018 judgment.

## I. STATEMENT OF FACTS

**A.    Andalusian Resorts and its common stock**

Andalusian Resorts and Spas, Inc. ("Andalusian Resorts" or "ARSP") is a Nevada corporation (Compl. ¶ 14). The Nevada Secretary of State revoked the company's business license on January 31, 2015. Andalusian Resorts' common stock was quoted on OTC Link operated by OTC Markets Group Inc. (ticker: ARSP). The Commission suspended trading in the

stock on May 19, 2014 (Compl. ¶ 5).[1]  Since then, Andalusian Resorts has been labeled "Caveat

Emptor" on OTC Market Group Inc.'s website (Compl. ¶ 14).[2]  The company did not have a

class of securities registered pursuant to the Securities Exchange Act of 1934 ("Exchange Act").

Andalusian Resorts' stock qualifies as a "penny stock" as defined by Section 3(a)(51) of the

Exchange Act, 15 U.S.C. § 78c (a)(51), and Rule 3a51-1, 17 C.F.R. § 240-3a51-1.  According to

Andalusian Resorts' press releases, the company's business plan purported to be the acquisition

and management of a chain of international premier luxury boutique hotels and resorts catering

to the lesbian, gay, bisexual and transgender ("LGBT") community.

**B.**      **Madsen gained control of Andalusian Resorts and recruited Fried to act as straw-man President and CEO**

As of the fall of 2013, Madsen controlled Andalusian Resorts (Compl. ¶¶ 1, 23-24).

Madsen recruited Bernard Fried ("Fried") to act as his nominee and to serve, in name only, as

President and Chief Executive Officer ("CEO") of Andalusian Resorts (Compl. ¶¶ 1, 23-24).  On

November 3, 2013, after recruiting Fried to act as his nominee, Madsen directed Fried to enter

into a share purchase agreement to buy a controlling block of stock of a publicly-traded micro-

cap shell company, Hui Ying Technology and Media Group Holding Company ("HUIY"), from

its then-majority shareholders to serve as an acquisition vehicle for the privately-held Andalusian

Resorts (Compl. ¶ 16).  Madsen had the controlling block transferred into Fried's name.  Fried

did not pay any money for the stock.

On November 14, 2013, Madsen emailed to Fried an option agreement to grant Madsen

the right to purchase Fried's control block of HUIY stock representing all common shares and all

---

[1] The Commission order suspending trading is available at:
https://www.sec.gov/litigation/suspensions/2014/34-72183.pdf.

[2] Information concerning OTC Markets Group's designation of "Caveat Emptor" can be found
at: https://www.otcmarkets.com/learn/caveat-emptor.

preferred shares of the company that Fried owned, for the fixed consideration of $10,000 at any time within the following five years, regardless of the then current market price of the stock (Compl. ¶ 17). Fried executed the option agreement in Madsen's favor. Although the control block of stock was never transferred out of Fried's name, the stock certificate was held by Madsen in a safe and Fried never obtained possession of it (Compl. ¶ 18).

In mid-November 2013, at Madsen's direction, Fried authorized and completed a reverse merger whereby HUIY acquired the private company Andalusian Resorts (Compl. ¶ 19). An Andalusian Resorts press release dated December 2, 2013 announced HUIY's acquisition of Andalusian Resorts and Fried's appointment as the new President of HUIY (Compl. ¶ 20). On March 6, 2014, the combined company officially changed its name to Andalusian Resorts and its stock ticker symbol from HUIY to ARSP (Compl. ¶ 21).

As described in several press releases, Andalusian Resorts' purported business plan was to first acquire and then manage a chain of "4 or 5 star rat[ed]" luxury boutique LGBT friendly resorts and spas (Compl. ¶ 22). In fact, the company had no meaningful assets with which to purchase or operate such real estate assets.

Fried nominally served as Andalusian Resorts' President, CEO, Secretary, Treasurer, and Chairman of the Board, despite having no previous educational training or practical experience in the hospitality industry (Compl. ¶ 23). Despite Fried being identified in Andalusian Resorts' documents and press releases as the President and CEO, it was in fact Madsen who was fully in charge of the company, making all of its substantive and strategic decisions while Fried's true role was to be a straw-man for Madsen, simply acting as Madsen's nominee (Compl. ¶¶ 23-24).

Madsen is a three-time financial fraud recidivist (Compl. ¶ 12). Madsen understood that his criminal and regulatory record, as well as the existence of a damaging third-party website that focused on alleged fraudulent conduct by Madsen and a business partner, could negatively affect

ARSP if Madsen were to be held out to the public as the company's CEO (Compl. ¶ 25). In particular, on November 5, 2001, Madsen pled guilty to mail fraud, in *United States v. John J. Madsen*, 01-cr-1010 (D. Ariz.), for his involvement in a fraudulent loan scheme that took place between 1994 and 1998, was sentenced to five years of probation, and ordered to pay $2.4 million in criminal restitution (Compl. ¶¶ 2, 12). In 2004, Madsen settled a civil regulatory action with the Arizona Corporation Commission for violations of the Arizona Securities Act's securities registration and sales provisions for his participation in a fraudulent private unregistered stock offering between 2001 and 2002, in which he consented to a cease and desist order, payment of $590,951 in restitution plus interest, and payment of $25,000 in administrative penalties (Compl. ¶ 25). *See* Arizona Corporation Commission, Docket No. S-03523A-03-0000, Decision No. 67086, entered June 29, 2004. Fried's publicly identified role concealed the fact that Madsen secretly controlled Andalusian Resorts.

Madsen knew, or was reckless in not knowing, that the press releases about Andalusian Resorts' purported intent to acquire the Mona Lisa Hotel and Casino ("Mona Lisa Hotel"), which he directed Fried to draft and issue, contained materially false and misleading information, and were intended to artificially increase both investor demand for the stock and the stock's price, allowing certain holders of unrestricted stock to profit from stock sales (Compl. ¶ 26). A higher stock price could also be used to facilitate the company's acquisition of hotel properties by using its artificially inflated stock, rather than cash, as consideration. Fried relied on Madsen to supply him with the information to use in the press releases, including Madsen's purported revenue projections (Compl. ¶ 34).

In December 2013, at Madsen's direction, Andalusian Resorts engaged a consultant ("Consultant"), along with his company ("Consultant Brothers"), to provide "brand awareness & product sales for [ARSP], merger & acquisition advisory services, and business financing

services" (Compl. ¶ 27).  At Madsen's direction, the Consultant was also tasked with helping

Fried draft and publish ARSP press releases to generate investor interest in the company, for the

purpose of increasing demand for and the price of ARSP's stock.  Madsen also recruited

additional persons to help generate interest in Andalusian Resorts and its stock (Compl. ¶ 28).

**C.    Andalusian Resorts' Letter of Intent to acquire the Mona Lisa Hotel**

On April 5, 2014, Fried, acting at Madsen's direction, signed a Letter of Intent  ("LOI")

to purchase the Mona Lisa Hotel from a Costa Rican company for consideration valued at $10

million (Compl. ¶ 35).  Fried had almost no personal involvement in sourcing, conducting due

diligence for, or negotiating the terms of the proposed transaction (Compl. ¶ 36).  Rather,

Madsen, not Fried, sent an email to others, stating, "We have agreed by both sides to a stock

exchange [] for two Hotel Casinos COSA RICA [sic].  We are able to take possession as early as

next Friday!!!!"  Similarly, Madsen, not Fried, negotiated the terms of the Mona Lisa Hotel LOI

with an attorney ("Attorney A"), who claimed to be the authorized officer of the hotel's

purported owner and countersigned the LOI on April 6, 2014 (Compl. ¶ 37).

Pursuant to the LOI, the hotel's purported owner agreed to "convey to [ARSP]

marketable and insurable title to said real property at closing," and in return Andalusian Resorts

promised to pay $10,000,000 in restricted stock priced at $1.10 per share (Compl. ¶ 38).  The

LOI provided that the closing "will take place when shares in [ARSP] trade at a minimum of

$1.10 per share for a consecutive ten day period" (Compl. 39).  At the time, Andalusian Resorts'

stock was not trading anywhere near $1.10.  During the week prior to Fried signing the LOI, the

average closing price of the stock was only $0.18 (Compl. ¶ 40).

The LOI also provided that the "[p]arties shall use their best reasonable efforts to enter

into a definitive agreement embodying the terms and provision[s] contained herein within 20

business days following the signing of this LOI" (Compl. ¶ 41).  But with hardly any corporate

assets that could be used to fund the cash purchase or any new/pending business projects that could reasonably and legitimately raise ARSP's stock price to $1.10, Madsen knew, or was reckless in not knowing, that the Mona Lisa Hotel acquisition was very unlikely to close pursuant to the terms of the LOI.

The LOI also required Andalusian Resorts to provide Attorney A with proof of available funds for the Mona Lisa Hotel purchase within "48 hours from acceptance of this LOI" (Compl. ¶ 42). Madsen knew, or was reckless in not knowing, that the company had virtually no cash or other marketable assets that could have easily been converted into cash.

To make it appear to the hotel's purported owner that Andalusian Resorts had the ability to finance the hotel acquisition as required under the terms of the LOI, the company obtained a commitment letter from Consultant Brothers on April 11, 2014, and provided it to Attorney A (Compl. ¶ 43). The letter, signed by Consultant, stated: "Please be advised of the following commitments for up to $10,000,000 million [sic] to assist in the purchase of (as specified in the Andalusian Letter of Intent) the Mona Lisa Hotel" (Compl. ¶ 44). The nature and source of the purported "commitments" identified in the rest of the letter were, on their face, indefinite and inadequate.

The commitment letter further stated that Consultant Brothers was working with a financier ("Financier") and his two entities to provide financing for Andalusian Resorts' acquisition of the Mona Lisa Hotel (Compl. 45). But the letter incongruously described a potential transaction "for up to $6 million" – *i.e.,* less than the $10 million in commitments described elsewhere in the letter. And the letter said that the Financier's entities "can issue definitive documents the same day that Due Diligence is received," which had not occurred yet. In fact, Financer and his entities did not have any involvement with, or intent to provide financing to, Andalusian Resorts (Compl. ¶46). Madsen knew, or was reckless in not knowing,

6

that Consultant Brothers did not have the ability, directly or indirectly, to provide Andalusian

Resorts with $10 million to finance a cash purchase of the Mona Lisa Hotel (Compl. ¶ 47).

**D.      At Madsen's direction, Fried made materially false and misleading statements in Andalusian Resorts' press releases concerning the purported acquisition of the Mona Lisa Hotel**

Fried, at Madsen's direction, drafted all of Andalusian Resorts' press releases until Fried

resigned as the company's President and CEO in June 2014 (Compl. ¶ 49).  Consultant helped

Fried to "dress them up" to make the press releases more attractive to potential investors before

they were issued to the public.

The LOI to acquire the Mona Lisa Hotel was fully executed on April 6, 2014, and both

parties were to use "best reasonable efforts . . . to enter into a definitive agreement" for the sale

of the hotel within 20 business days (Compl. ¶ 48) (*i.e.,* by May 2, 2014).  Andalusian Resorts,

however, did not publicly disclose the LOI for over a month.

On May 12, 2014, Fried, acting at Madsen's direction, drafted and caused Andalusian

Resorts to issue a press release announcing the signing of the LOI to acquire the Mona Lisa

Hotel (Compl. ¶ 50).  The press release failed to disclose any of the substantive terms contained

in the LOI, such as the purchase price, the form of consideration to be used, the unusual

circumstances under which closing could occur, the availability of financing, and the closing

schedule.  In light of the company's dismal financial condition, the current market price of its

stock, and the unusual and highly unrealistic terms of the LOI, the press release was materially

misleading in that it did not provide investors with sufficient information to evaluate the

probability of the acquisition actually moving forward pursuant to the LOI.

The May 12 press release also did not disclose that the LOI had been entered into in early

April 2014, and failed to disclose that a definitive acquisition agreement had still not been

executed (Compl. ¶ 51). The May 12 press release included a materially false and misleading

quote from Fried, as ARSP's President and CEO, stating:

> After completion of this transaction and integration of our business plan, we hope to realize revenues of US $4,800,000 in the first full year…. The parties are close to finalizing the terms of the acquisition and we estimate that the final terms of the acquisition will be announced to the shareholders within the next few weeks. The completion of the acquisition is dependent on, among other things, the completion of due diligence satisfactory to the Company.

(Compl. ¶ 52.)

Two days later, on May 14, 2014, Fried, acting at Madsen's direction and assisted by Consultant, drafted and authorized the issuance of another ARSP press release concerning the proposed Mona Lisa Hotel transaction (Compl. ¶ 53).  The press release again identified Fried as ARSP's President and CEO, and again included a materially false and misleading quote from Fried, saying:

> This acquisition of the Mona Lisa Hotel … adds to the excitement for the Company and its shareholders.  [ARSP's] pledge is to continue to inform the shareholders on the status of the projects and continue to move the Company forward and implement [ARSP's] Business Plan to provide increased shareholder value.

Although the May 14 press release stated that its purpose was to provide "additional details in regard to the [LOI] for the acquisition of the Mona Lisa Hotel," none of the preliminary substantive terms and conditions agreed to and memorialized in the LOI were actually disclosed (Compl. ¶ 54).  The press release included the text of a letter from Attorney A to Fried about the Mona Lisa Hotel and its future business prospects, in which Attorney A identified himself as the "current owner, attorney and investor of the Mona Lisa [Hotel]" (Compl. ¶¶ 54-55).

Also on May 14, Andalusian Resorts re-issued its May 12 press release, which as described above was materially false and misleading.  Madsen was aware that several news sources including Bloomberg, Marketwatch.com, Businesswire.com, and Money.msn.com took note of the ARSP press releases regarding the LOI and posted or discussed them on their websites (Compl. ¶ 56).

8

On May 19, 2014, the Commission issued an order suspending trading in ARSP's securities due to "questions concerning the adequacy and accuracy of assertions by ARSP, and by others, in press releases and other public statements to investors concerning, among other things, the company's business combinations" (Compl. ¶ 57). On May 20, 2014, Fried caused Andalusian Resorts to issue a press release acknowledging the trading suspension and included an internet link to a copy of the LOI that "contains more detailed information regarding the terms of the acquisition" (Compl. ¶ 58).

**E.      Madsen failed to verify ownership of the Mona Lisa Hotel prior to directing Fried to have Andalusian Resorts issue the press releases touting the LOI**

When Fried, acting at Madsen's direction, caused Andalusian Resorts to issue the May 12 and May 14 press releases touting the LOI, neither Attorney A nor his Costa Rican Company actually owned legal title to the Mona Lisa Hotel (Compl. ¶ 59). Attorney A's company only held a lease to operate the hotel, and legal title to the Mona Lisa Hotel was held by an unaffiliated Costa Rican company. When the May 12 and May 14 press releases were issued, Andalusian Resorts' local Costa Rican counsel had not received any verification of Attorney A's and his company's purported direct or indirect ownership of, or legal title to, the Mona Lisa Hotel (Compl. ¶ 60).

The May 12 and May 14 press releases were intended to mislead the public about the likelihood of the Mona Lisa Hotel acquisition (Compl. ¶ 61). A definitive agreement was never reached between Andalusian Resorts and the true owners of the Mona Lisa Hotel, and Andalusian Resorts was never able to satisfy the key terms of the LOI. In directing Fried to draft and publicly disseminate these press releases, Madsen intended fraudulently to generate demand for the company's stock and increase its share price, which would enable Madsen or others to profit from selling their shares to the unwary investing public.

## II. ARGUMENT

Based on the undisputable facts as alleged in the complaint, Madsen engaged in conduct that merits the imposition of a maximum third tier monetary penalty, as explained below. As alleged in the complaint, Madsen violated the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. A maximum third tier civil penalty is appropriate in this action, particularly in light of Madsen being now a three-time financial fraud recidivist and whose conduct would have likely caused serious investor harm had the Commission not quickly halted trading in Andalusian Resorts' stock. While Madsen is now subject to a permanent injunction and penny stock bar, it is entirely appropriate for the Court to impose a civil money penalty on Madsen to sanction him for his misconduct and to deter others from engaging in future pump-and-dump schemes.

**A.    The Exchange Act establishes three tiers of civil monetary penalties**

Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), provides that, upon a showing of a violation of the title, the Commission may seek, and the Court may impose, a civil penalty to be paid by the person who committed the violations. The statute provides for three tiers of penalties, and that the amount of the penalty to be imposed "for each violation" shall not exceed (1) the amount determined by the applicable statutory penalty tier; or (2) the gross amount of pecuniary gain to the defendant as a result of the violations. "Such penalties are designed to deter future violations of the securities laws and thereby further the goals of 'encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.'" *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (quoting *SEC v. Palmisano,* 135 F.3d 860, 866 (2d Cir. 1998)). Here, because the Commission is not pursuing disgorgement of any pecuniary gains as to Madsen, it is

incumbent upon the Court to look to the statutory tier system in determining an appropriate civil penalty amount.

Under the Exchange Act's civil penalty provisions, "the Court determines the amount of the civil penalty in light of the facts and circumstances of the particular case. Penalties are described in three tiers, imposing escalating fines according to the severity of the violations." *SEC v. Metcalf*, No. 11-cv- 493 (CM), 2012 WL 5519358, at *7 (S.D.N.Y. Nov. 13, 2012). Here, as Madsen is a natural person, the applicable inflation adjusted maximum civil penalty amount for *each* violation is:[3]

- First Tier: $7,500 (for any violation of the Exchange Act);
- Second Tier: $80,000 (violations involving fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement); and
- Third Tier - $160,000 (violations satisfying the Second Tier requirements and the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons).

## B.    A third tier penalty is appropriate as to Madsen

The Court has discretion to determine the amount of penalty to be imposed. As the Second Circuit observed in *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013), "[b]eyond setting maximum penalties, the statutes leave the 'actual amount of the penalty … up to the discretion of the district court," and the district court's decision is reviewed only "for abuse of discretion." *Id.* (quoting *SEC v. Kern,* 425 F.3d 143, 153 (2d Cir. 2005)). Thus, "[t]hough the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left up to the discretion of

---

[3] *Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2018)* (available at: https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm); Release Nos. 33-9387, 34-68994, IA-3557, IC-30408, dated February 27, 2013 (effective Mar. 5, 2013), previously found at 17 CFR 201.1005 and Table V to Subpart E of Part 201.

the district court." *SEC v. Tourre*, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014) (citing *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005)).

The factors courts have considered in exercising this discretion and determining the amount of penalty to assess include:

> (1) the egregiousness of the defendant's conduct, (2) the degree of the defendant's scienter, (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Id.* (quoting *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). *See also SEC v. Opulentica*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007); *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003); *SEC v. Coates*, 137 F. Supp. 2d 413, 429 (S.D.N.Y. 2001). A consideration of each of the factors weighs heavily in favor of imposing a maximum third tier penalty as to Madsen.

As described below, Courts regularly impose third tier penalties against persons who engaged in fraudulent schemes like the one Madsen orchestrated and carried out. *See, e.g., SEC v. Alternative Green Technologies, Inc.,* No. 11-cv-9056 (SAS), 2014 WL 7146032, at *6 (S.D.N.Y. Dec. 15, 2014) (imposing a then maximum third tier penalty of $130,000 on individual defendant where it was the individual's "first violation of the securities laws" resulting from his participation in an offering fraud scheme resulting in investor losses of approximately $300,000); *SEC v. East Delta Resources Corp.*, No. 10-cv-310 (SJF), 2012 WL 3903478, at *8-9 (E.D.N.Y. Aug. 31, 2012) (imposing a then maximum third tier penalty of $130,000 for each of the individual defendants' three violations, totaling $390,000 each, resulting from their involvement in a market manipulation scheme). And courts have made the determination to impose third tier penalties regardless of whether the defendants profited from their misconduct. *See, e.g., SEC v. McCaskey*, No. 98-cv-6153 (SWK), 2002 WL 850001, *13-

12

14 (S.D.N.Y. Mar. 26, 2002) (finding a then maximum $100,000 third tier penalty was appropriate whether or not the defendant "himself incurred a net loss or gain over the manipulation period" as it was "entirely irrelevant to the infliction of losses, or the 'risk' of loss, on others."); *SEC v. Kane*, No. 97-cv-2931 (CBM), 2003 WL 1741293, at *3 (S.D.N.Y. Apr. 1, 2003) (finding a third tier penalty of $200,000 was appropriate due to significant risk of harm even though "the defendant may not have ultimately realized a net gain).

### 1.  Madsen's conduct was egregious

A maximum third tier civil penalty for each violation is appropriate to impose against Madsen in this matter.  Madsen's conduct was highly egregious, regardless of whether he ultimately profited from it.  He intentionally concealed his control of ARSP and his orchestrating the scheme by means of a straw-man President and CEO.  Madsen did this because he believed that his open leadership of Andalusian Resorts would likely harm its future prospects (and stock price) due to his criminal and regulatory record.  Moreover, Madsen directed Fried to draft and issue corporate press releases that he knew or was reckless in not knowing contained material false and misleading statements concerning: (1) Fried's position and function with Andalusian Resorts; (2) Andalusian Resorts' intent and ability to acquire the Mona Lisa Hotel; and (3) the actual ownership of the Mona Lisa Hotel.

### 2.  Madsen acted with a high degree of scienter

Madsen's conduct evinced a high degree of scienter.  He positioned Fried as a straw-man in charge of Andalusian Resorts to carry out his scheme.  He directed Fried to issue materially false and misleading press releases.  Moreover, Madsen concealed from the investing public the fact that he was actual person in control of Andalusian Resorts and that he had a history of being involved in fraudulent conduct, including fraud related to securities.  Also, Madsen failed to confirm ownership of the Mona Lisa Hotel before directing Fried to issue press releases touting

the LOI.  When an issuer provides information to the investing public, it must do so in a truthful

manner.  Madsen's intentional conduct caused the investing public to be deceived about

Andalusian Resorts and its business prospects.  Madsen therefore acted with a high degree of

scienter.

### 3.  Madsen's conduct created the risk of substantial losses to other persons

Madsen's scheme to inflate the price of ARSP only failed because the Commission halted

trading in Andalusian Resorts' stock soon after the dissemination of the fraudulent press releases.

Absent the trading suspension, it is likely that investors would have suffered substantial harm

through purchases of manipulated stock.  Under the circumstances, the absence of investor harm,

which only resulted because of the Commission halting trading and not because of any actions of

defendant, is irrelevant to the penalty analysis.  In another manipulation enforcement action, the

magistrate in *SEC v. McCaskey*, No. 98-cv-6153 (SWK), 2002 WL 850001, *13-14 (S.D.N.Y.

Mar. 26, 2002), recommended a maximum third tier penalty based on defendant having directly

or indirectly "created a significant *risk* of substantial losses to other persons," regardless of

whether the manipulation was successful.  *Id.* (quoting 15 U.S.C. § 78u(d)(3)(B)(iii)) (emphasis

in original).  As the court observed, "[w]hether or not McCaskey himself incurred a net loss or

gain or the manipulation period is entirely irrelevant to the infliction of losses, or the 'risk' of

loss, on others."  *Id.  See also SEC v. Kane*, No. 97-cv-2931 (CBM), 2003 WL 1741293, at *3

(S.D.N.Y. Apr. 1, 2003) ("That the defendant may not have ultimately realized a net gain

(inasmuch as he disgorged all profits from his illegal activities) is irrelevant to consideration of

whether he created a significant 'risk' of loss on others"; citing *McCaskey*).  Similarly, Madsen's

conduct in attempting artificially to increase both investor demand for ARSP stock and ARSP's

stock price, with the goal of allowing certain holders of unrestricted stock to profit from stock

sales, created a risk of substantial losses to investors.  Madsen's conduct merits a third tier penalty.

### 4.  Madsen's conduct was recurrent and not isolated

Madsen's conduct was recurrent and not isolated.  Madsen began his scheme in the Fall of 2013 and it continued until the Spring of 2014.  Madsen directed Fried to issue multiple misleading press releases.  And he engaged in other conduct that helped to carry out the scheme, such as recruiting Fried as the straw-man CEO and concealing his recidivist status and control of ARSP from the investing public.  Therefore, Madsen's conduct cannot be considered isolated.

### 5.  The maximum penalty amount should not be reduced based on Madsen's financial condition

Madsen is a relatively young man, who has repeatedly engaged in financial fraud.  In 2001, Madsen pled guilty to a federal mail fraud criminal charge for a fraudulent loan scheme, and in 2004 settled civil regulatory charges in Arizona for participating in a fraudulent private unregistered stock offering.  Despite his prior misconduct, Madsen was not deterred from conceiving and carrying out yet another fraudulent scheme.  Regardless of his current or future financial condition, Madsen must be punished for his continued illegal actions, in addition to being deterred (along with others contemplating such illegal acts) from engaging in such conduct going forward.[4]

### C.  The Court has broad discretion to determine the number of violations

The Court has broad discretion to determine how many violations defendant committed for purposes of calculating the penalty.  "Case law indicates . . . that district courts have the

---

[4] On November 8, 2017, Fried pled guilty to conspiracy to commit securities fraud based on the same conduct as alleged in the complaint, as well as similar conduct concerning a second public company.  *See U.S. v. Bernard Arthur Fried*, 17-cr-607 (RRM) (E.D.N.Y.) (docket no. 3 and 10).  Thus, although the consent judgment as to Fried did not provide for the imposition of civil money penalties, Fried is subject to additional sanctions when he is sentenced in the criminal action.

discretion to calculate penalties based on each violative act." *In re Reserve Fund Sec. & Derivative Litig.*, No. 09-cv-4346 (PGG), 2013 WL 5432334, at *20 (S.D.N.Y. Sept. 30, 2013) (collecting cases). *See also SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 n.7 (2d Cir. 2013) ("we find no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation").

The complaint charges that Madsen directly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c), and that Madsen aided and abetted ARSP's and Fried's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b). There are multiple ways the Court can calculate the number of violations. For instance, the Court could impose one third tier penalty for all of Madsen's illegal conduct. Alternatively, the Court could impose a third tier penalty for each claim brought against Madsen, resulting in two violations (*see* complaint, docket no. 1, Second and Third Claims for Relief), or for each provision of the securities law that Madsen violated or aided and abetted violations, resulting in five violations (*see id.*). Or the Court could impose a third tier penalty for each misleading statement that Madsen directed Fried to make, resulting in at least four violations (*see* complaint ¶¶ 4, 20, 50, 53, 55).

In another case involving market manipulation, *SEC v. East Delta Resources Corp.*, No. 10-cv-310 (SJF), 2012 WL 3903478, at *8-9 (E.D.N.Y. Aug. 31, 2012), the court imposed a maximum third tier penalty for each statute or rule violated. In particular, as to certain individual defendants, the court imposed a then-maximum third tier penalty of $130,000 for each of the defendants' three violations, of Section 10(b) of the Exchange Act and Rule 10b-5, as well as Section 17(a) of the Securities Act of 1933, for a total penalty of $390,000 each. *See id.* In *SEC v. Alternative Green Technologies, Inc.,* No. 11-cv-9056 (SAS), 2014 WL 7146032, at *6 (S.D.N.Y. Dec. 15, 2014), the court imposed one then-maximum third tier penalty of $130,000

16

on the individual defendant. The court reasoned that one violation was appropriate because it was defendant's "first violation of the securities laws," resulting from his participation in an offering fraud scheme resulting in investor losses of approximately $300,000, and that "imposing only one maximum civil penalty will serve as a sufficient deterrent, both specifically and generally, to future securities violations." *Id.*

In light of these factors, the Commission respectfully requests that the Court impose the maximum available civil penalty, in an amount that the Court determines to be appropriate.

### III. <u>CONCLUSION</u>

For all the foregoing reasons, the Commission respectfully requests that the Court enter a Final Judgment against Madsen and order the relief described above.

Dated: New York, New York
      June 29, 2018

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Paul G. Gizzi*
*/s/ Brenda W.M. Chang*
*/s/ John Lehmann*
_____

Paul G. Gizzi
Brenda W.M. Chang
John Lehmann
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1100

</div>