UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
SECURITIES AND EXCHANGE COMMISSION, :
:
Plaintiff, :
: 17-CV-8300 (JMF)
-v- :
: OPINION AND ORDER
JOHN MADSEN, :
:
Defendant. :
:
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      The Securities and Exchange Commission (the "Commission") brings this civil action against John Madsen for engaging in a "pump-and-dump" scheme in violation of the Securities Exchange Act of 1934 and associated regulations. On February 28, 2018, Madsen consented to entry of a judgment against him and the issuance of a permanent injunction. (Docket No. 22-1). Accordingly, on March 9, 2018, the Court entered (and, on March 12, 2018, amended) a consent judgment against Madsen, and issued an injunction barring him from future violations of Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and from participating in any offering of a penny stock. (Docket No. 27 ("Am. Consent Judgment")). Left unresolved was the nature and size of a civil monetary penalty, if any. (Docket No. 22). The Commission now moves for imposition of a civil penalty and entry of final judgment against Madsen. (Docket No. 51). For the reasons that follow, the Court grants the Commission's motion and imposes a "second-tier" civil penalty totaling $80,000.

**BACKGROUND**

The following facts are drawn from the allegations in the Complaint (Docket No. 1 ("Compl.")), which form the basis of the Court's decision and which — pursuant to the terms of the Amended Consent Judgment (*see* Am. Consent Judgment 3) — are assumed to be true for purposes of this motion. *See, e.g.*, *SEC v. Juno Mother Earth Asset Mgmt., LLC*, No. 11-CIV-1778 (TPG), 2014 WL 1325912, at *3 (S.D.N.Y. Mar. 31, 2014) ("When a defendant enters a consent judgment with the Commission and agrees not to challenge the details of the Commission's complaint, courts accept the allegations in the complaint to be true when deciding the Commission's subsequent motion for monetary relief."); *see also SEC v. Bankosky*, 716 F.3d 45, 46 (2d Cir. 2013) (per curiam) (accepting allegations in the complaint as true for purposes of a specific motion, pursuant to the parties' consent judgment).

In the fall of 2013, Madsen recruited Bernard Fried to serve as President and Chief Executive Officer of Andalusian Resorts and Spas, Inc. ("ARSP"), then a privately held company controlled by Madsen that purported to be in the business of acquiring and managing luxury hotels and resorts catering to the lesbian, gay, bisexual, and transgender community. (Compl. ¶¶ 14-16). At Madsen's direction, Fried then purchased (in his own name) a controlling share of Hui Ying Technology and Media Group Holding Company ("HUIY"), a publicly traded company with a very small market capitalization. (*Id.* ¶¶ 15-16). Thereafter, Madsen and Fried executed an option agreement granting Madsen the right to purchase Fried's stake in HUIY for a fixed price of $10,000 within the following five years. (*Id.* ¶ 17). Next, Madsen directed Fried, as HUIY's controlling shareholder, to authorize HUIY's acquisition of ARSP. (*Id.* ¶ 19). Again, Fried complied, and on December 2, 2013, HUIY announced its acquisition of ARSP and Fried's appointment as HUIY's President. (*Id.* ¶¶ 19-20). In March 2014, HUIY completed the final

step of this "reverse merger," changing its name and stock symbol from HUIY to ARSP. (*Id.* ¶ 21). Although Fried nominally served as ARSP's President, CEO, Secretary, Treasurer, and Chairman of the Board, Madsen retained effective control over the company, including its substantive and strategic decisions. (*Id.* ¶¶ 23-24, 33).

Acting on his own and through Fried, Madsen arranged for ARSP to enter into a letter of intent to purchase the "Mona Lisa Hotel" from a Costa Rican company for $10 million worth of ARSP restricted stock. (*Id.* ¶¶ 35-41). At the time, however, ARSP stock was not trading anywhere near the price contemplated by the letter of intent. (*Id.* ¶ 39). Nor did ARSP have anything remotely like the cash or other assets that would have been necessary to complete the transaction. (*Id.* ¶ 42). Accordingly, Madsen either knew or was reckless in not knowing that ARSP had no realistic prospect of closing the Mona Lisa Hotel purchase as contemplated in the letter of intent. (*Id.* ¶¶ 41, 47). Nevertheless, Madsen orchestrated publication of two press releases trumpeting the transaction. In the first, dated May 12, 2014, Fried was quoted as saying that "[a]fter completion of this transaction . . . , we hope to realize revenues of US $4,800,000 in the first full year." (*Id.* ¶ 52). The press release, however, did not disclose the terms of the transaction, let alone provide information that could have enabled investors to discern what would have been obvious from ARSP's financial condition: that ARSP had no hope of actually completing the transaction. (*Id.* ¶ 50). The second press release, dated May 14, 2014, offered "additional details in regard to . . . the acquisition of the Mona Lisa Hotel," but once again omitted the terms in the letter of intent. (*Id.* ¶ 54). The May 14th press release also included a forward-looking letter from an attorney who identified himself as the "current owner, attorney and investor of the Mona Lisa [Hotel]." (*Id.* ¶ 55). At the time, however, neither that attorney nor the Costa Rican company with which ARSP had entered into the letter of intent actually held

legal title to the Mona Lisa Hotel. (*Id.* ¶ 59). (The Costa Rican company held only a lease to operate the hotel; a *different* company held legal title. (*Id.*).)

Although Madsen presumably intended to complete his "pump and dump" scheme by trading in ARSP stock after fraudulently inflating its share price (*id.* ¶ 61), he never got the chance: On May 19, 2014, the Commission issued an order suspending trading in ARSP stock because of "questions concerning the adequacy and accuracy of assertions by ARSP, and by others, in press releases and other public statements to investors concerning, among other things, the company's business combinations." (*Id.* ¶ 57). On October 27, 2017, the Commission brought this action against Madsen, ARSP, and Fried, seeking (as to Madsen) injunctive relief and civil monetary penalties for alleged violations of Section 10(b) Rules 10b-5(a) and (c), and for allegedly aiding and abetting ARSP and Fried's violations of Section 10(b) and Rule 10b-5(b). (Compl. ¶¶ 62-70). Fried ultimately agreed to a consent judgment resolving all claims against him (Docket No. 17), and the Court entered a consent judgment enjoining Fried from repeating his unlawful conduct and ordering him to pay disgorgement and prejudgment interest totaling $3,311.44 (Docket No. 18). (In a separate criminal action, Fried pleaded guilty to one count of conspiracy to commit securities fraud. *See United States v. Fried*, 17-CR-607, Docket No. 8, Docket No. 10, at 25-27 (E.D.N.Y. Nov. 8, 2017). The Commission represents that Fried's civil disgorgement and prejudgment interest obligation will be offset by an order of forfeiture or restitution when Fried is sentenced in that criminal proceeding. (Docket No. 54 ("Comm'n Reply"), at 3).) The Commission also obtained a default judgment against ARSP, consisting of similar injunctive relief. (Docket No. 44).

As noted, the Commission and Madsen agreed on the terms of a partial consent judgment, which the Court entered. (Docket Nos. 24 & 27). The consent judgment included injunctive

4

relief barring Madsen from repeating his unlawful conduct, and barring him from participating in any future offerings of penny stocks. (Am. Consent Judgment 2). The consent judgment further provided that "the Court shall determine whether it is appropriate to order" either disgorgement or imposition of civil penalties "upon motion of the Commission." (*Id.*). The consent judgment provided that, for the purposes of any such a motion, Madsen would be precluded from challenging the validity of the consent judgment or from arguing that he did not violate the federal securities laws as alleged in the Complaint, that the facts as alleged in the Complaint would be accepted as true, and that the Court would resolve the motion on the basis of the record without regard to the usual standards for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure 56(c) (*Id.* at 3). The Commission now moves for imposition of a civil penalty and entry of final judgment against Madsen. (Docket No. 51).[1]

## DISCUSSION

Congress has created three "tiers" of civil penalties for violators of the Securities Exchange Act of 1934 ("Exchange Act") and its accompanying regulations. *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, § 201, Pub. L. No. 101-429, 104 Stat. 931, *codified as amended at* 15 U.S.C. § 78u (the "Remedies Act"). A "first-tier" penalty may be imposed for any violation of the Exchange Act or a related regulation. 15 U.S.C. § 78u(d)(3)(B)(i). A "second-tier" penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* § 78u(d)(3)(B)(ii). And a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the "violation directly or indirectly resulted in substantial losses

---

[1] The Commission has withdrawn its claim for disgorgement and prejudgment interest. (*See* Docket No. 45).

or created a significant risk of substantial losses to other persons." *Id.* § 78u(d)(3)(B)(iii). *See generally SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013), *as amended* (Nov. 26, 2013); *SEC v. Kapur*, No. 11-CV-8094 (PAE), 2012 WL 5964389, at *6-7 (S.D.N.Y. Nov. 29, 2012).

The Commission seeks a "third-tier" penalty against Madsen, arguing that in addition to the fraud alleged in the Complaint, Madsen's conduct "created a significant risk of substantial losses to other persons." (Docket No. 52 ("Comm'n Mem."), at 14-15). The Court disagrees. While the allegations in the Complaint certainly establish that Madsen's conduct involved "fraud, deceit, [and] manipulation," not to mention "deliberate or reckless disregard of a regulatory requirement" — and thus satisfy the requirements for a "second-tier" penalty — the Commission has failed to establish Madsen's conduct also "resulted in substantial losses or created a significant risk of substantial losses to other persons."[2] In particular, the Complaint in this case fails to allege, and the Commission has not otherwise established, that the "pump" part of Madsen's "pump-and-dump" scheme actually worked. For example, the Commission has offered no evidence that the Mona Lisa press releases were successful in inducing reliance by potential investors or that any investors considered purchasing (or did purchase) ARSP stock before the Commission halted trading. Nor has the Commission presented any allegations or evidence that the trading volume or price of ARSP stock were affected by Madsen's conduct.

Courts have reached differing conclusions about whether they can infer a "significant risk of substantial losses to other persons" without such evidence, and the Second Circuit does not appear to have addressed the question. In some settings, investors are entitled to a presumption that when they trade a security in a generally efficient market, they do so in reliance on all

---

2     The Commission concedes that Madsen's conduct did not *actually* result in substantial losses to other persons. (Comm'n Mem. 14-15; Comm'n Reply, at 5-6).

6

public, material statements (including fraudulent misrepresentations). *See In re Petrobras Secs.*, 862 F.3d 250, 275 (2d Cir. 2017) (discussing the so-called "*Basic* presumption"). Consistent with that presumption, some courts have held that a "significant risk" of loss to investors exists wherever the fraudulent statements at issue "would have been important to any reasonable shareholder," and have not required concrete evidence that any investors traded (or were at "risk" of trading) in reliance on such statements. *SEC v. Monterosso*, 557 F. App'x 917, 929 (11th Cir. 2014); *see also, e.g.*, *U.S. SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009) (reasoning that a defendant's mere "dissemination of materially false information create[d] a significant risk of substantial loss to the investing public"). By contrast, other courts have refused to infer a "significant risk of substantial losses" in the absence of proof that such a risk actually existed. *See, e.g.*, *SEC v. Todt*, No. 98-CV-3980 (JGK), 2000 WL 223836, at *12 (S.D.N.Y. Feb. 25, 2000) (declining to impose a third-tier penalty in the absence of evidence that any investors "ever seriously entertained" transacting based on the fraud); *cf. SEC v. Stone*, No. 06-CV-6258 (HB), 2009 WL 82661, at *7 (S.D.N.Y. Jan. 13, 2009) (imposing a second-tier penalty despite evidence that the defendant's conduct "resulted in a dramatic upswing in [the] stock price and thus created a high risk of loss to investors who bought the stock in reliance on such fraud").

The Court agrees with the latter view. Although all Section 10(b) or Rule 10b-5 frauds could be said to create *some* "risk" of *some* "harm" to investors, the Remedies Act reserves third-tier civil penalties for those frauds that create a *significant* risk of *substantial* losses. 15 U.S.C. § 78u(d)(3)(B)(iii) (both emphases added). If the mere existence of a fraudulent scheme were enough to satisfy that requirement, then *every* violation of the Exchange Act would merit a "third-tier" penalty under the Remedies Act. *See, e.g.*, *SEC v. Carrillo Huettel LLP*, No. 13-CV-

1735 (GBD) (JCF), 2017 WL 213067, at *9 n.15 (S.D.N.Y. Jan. 17, 2017) (rejecting the Commission's argument that the sale of unregistered securities "creates a substantial risk of loss 'as a matter of law'" on the ground that, if adopted, "nearly *every* violation of Section 5(a) of the Securities Act would merit tier-three penalties, whether or not the SEC presented argument or evidence of risk of loss"), *report and recommendation adopted*, 2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017). That outcome would be inconsistent with the plain language and structure of the Remedies Act. Instead, consistent with the plain language and structure of the Act, the Court holds that only those fraudulent schemes that create either actual, "substantial losses" or "a significant risk of substantial losses" are eligible for a third-tier penalty. 15 U.S.C. § 78u(d)(3)(B)(iii). More to the point, a third-tier penalty is warranted only where the Commission proves that that requirement is met.

Given the absence of such proof here, the Court concludes that the second-tier penalty maximum applies to Madsen's conduct. The inflation-adjusted maximum second-tier penalty for conduct by a natural person occurring at the time alleged in the Complaint is $80,000. *See Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission*, U.S. Secs. & Exchange Comm'n, https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm (last visited October 17, 2018). Still, although the statutory "tier" establishes the maximum penalty, "the actual amount of the penalty [is] left up to the discretion of the district court," *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005), to be fixed "in light of the facts and circumstances," 15 U.S.C. § 78u(d)(3)(B)(i). The purpose of such civil penalties is to achieve "the dual goals of punishment of the individual violator and deterrence of future violations." *SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001) (internal quotation marks omitted). Once the statutory maximum has been determined, courts weigh several factors

in determining whether to impose a fine — and if so, what the amount of the fine should be — including "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

Having weighed each of the relevant factors, the Court determines that a maximum second-tier penalty of $80,000 is appropriate in this case. Madsen's conduct, as alleged in the Complaint, was egregious and intentional. Although the Commission has failed to prove that that conduct created a "risk of substantial losses" significant enough to trigger the third-tier penalty maximum, there was undoubtedly some risk that Madsen's "pump-and-dump" scheme would work and cause losses to unwitting investors.[3] Given the recurring acts involved the scheme alleged here, along with Madsen's status as a securities-fraud recidivist (*see* Compl. ¶ 12), the Commission has established that Madsen's conduct was "recurrent." *See SEC v. Curshen*, No. 08-CV-7893 (PGG), 2014 WL 12791876, at *13 (S.D.N.Y. Mar. 21, 2014) (imposing a maximum second-tier penalty based partly on the defendant's recidivism). And — despite arguing that any penalty should be reduced based on his financial condition — Madsen fails to demonstrate (indeed, offers no evidence whatsoever) that his financial condition warrants such a reduction. (Docket No. 53 ("Madsen Mem."), at 12).

Finally, because the statutory penalty provisions authorize civil penalties "for each violation," 15 U.S.C. § 78u(d)(3)(B)(i), but do not define the term "violation," courts exercise

---

[3] Given that only the *risk* of harm is at issue here, the Court agrees with the Commission that the Commission's success in halting trading before any harm could occur should not weigh in Madsen's favor. (Comm'n Reply 5-6).

9

wide discretion in calculating the number of "violations," and thus the number of penalties to be imposed in a given case. *See In re Reserve Fund Secs. & Derivative Litig.*, No. 09-CV-4346 (PGG), 2013 WL 5432334, at *20 (S.D.N.Y. Sept. 30, 2013) (collecting varying methodologies for calculating the number of "violations"). The Commission reviews several possible methods for calculating the number of violations in this case, but does not urge any of them on the Court, let alone offer any reason why the Court should construe Madsen's conduct as involving multiple violations (beyond suggesting that it may do so). (Comm'n Mem. 15-16). In light of the Commission's halfhearted presentation, and having reviewed the allegations in the Complaint and applicable law, the Court sees no reason to multiply the statutory penalty by crafting "extra" violations out of Madsen's short-lived scheme. Thus, the Court treats Madsen's conduct as a single "violation" within the meaning of the Remedies Act.

The Court has considered, and rejected, Madsen's arguments in opposition to any civil penalty (or in favor of a lower one). Madsen devotes most of his brief to contesting the facts of his case (Madsen Mem. 1-11), which, as noted, he is precluded from doing under the terms of the consent judgment (Am. Consent Judgment 3). *See Juno Mother Earth Asset Mgmt.*, 2014 WL 1325912, at *3. Similarly, Madsen's protestation that he did not act with a high degree of scienter (Madsen Mem. 12) flies in the face of the Complaint's allegations about his state of mind (*see, e.g.*, Compl. ¶¶ 26, 61). Madsen also suggests that his penalty should be "consistent with that imposed upon" Fried. (Madsen Mem. 13). But the disgorgement penalty to which Fried agreed in his consent judgment (Docket No. 18, at 3) would be irrelevant here even if *disgorgement* were the rationale for the penalty to be imposed on Madsen. *See SEC v.*

*Mortenson*, No. 04-CV-2276 (SJF), 2013 WL 991334, at *5 (E.D.N.Y. Mar. 11, 2013).[4] It is all the more irrelevant given that the purpose of Madsen's penalty is not to strip him of any ill-gotten gains, but to serve "the dual goals of punishment of the *individual* violator and deterrence of future violations," *Coates*, 137 F. Supp. 2d at 428 (emphasis added), an entirely different analysis that the Court makes on an individualized basis. Finally, as discussed above, Madsen argues that any penalty should be reduced because of his financial condition, but supplies no evidence (or, for that matter, argument) beyond that bare assertion.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Commission's motion and imposes a "second-tier" civil penalty on Madsen in the amount of $80,000. By separate Order to be entered today, the Court will direct the Clerk to enter final judgment consistent with this Opinion. The Clerk of Court is directed to terminate Docket No. 51 and to close the case.

SO ORDERED.

Dated: October 17, 2018
New York, New York

JESSE M. FURMAN
United States District Judge

---

[4] Moreover, as discussed above, Fried also faces the possibility of significant restitution or forfeiture in his parallel criminal proceedings.